# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | | |
|---|---|---|
| RICKY FARRUGIA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| VS. | : | |
| | : | CIVIL No: 5:16-CV-128 (MTT)-CHW |
| GEORGE IVEY, *et al.*, | : | |
| | : | PROCEEDINGS UNDER 42 U.S.C. § 1983 |
| Defendants | : | |

## REPORT & RECOMMENDATION

Plaintiff Ricky Farrguia a state inmate currently confined at Hancock State Prison ("HSP"), filed a *pro se* complaint pursuant to 42 U.S.C. § 1983. Doc. 1. Plaintiff's Complaint, filed April 8, 2016, asserts that Defendants violated his rights under the First Amendment, Section 3 of the Religious Land Use Institutionalized Persons Act ("RLUIPA"), and the Equal Protection Clause. Doc. 1; Doc. 12, pp. 4-5. Because Plaintiff has not properly exhausted his available administrative remedies in accordance with the Prison Litigation Reform Act ("PLRA"), it is **RECOMMENDED** that Defendants Ivey and Turner's Motions to Dismiss (Doc. 17) be **GRANTED**, and that Plaintiff's claims be **DISMISSED.** Additionally, Plaintiff's Motion to Appoint Counsel (Doc. 18) is **DENIED.**

Before addressing Defendants' Motion to Dismiss, the Court considers Plaintiff's motion for the appointment of counsel. Doc. 18. The Court may, under 28 U.S.C. § 1915, appoint counsel in a civil case for a plaintiff unable to afford one. Civil litigants (including prisoners pursuing a § 1983 action), however, have no absolute constitutional right to the appointment of counsel. *Poole v. Lambert*, 819 F.2d 1025, 1028 (11th Cir. 1987). The appointment of counsel

in a civil case is "a privilege that is justified only by exceptional circumstances, such as where the facts and legal issues are novel or complex" thus "require the assistance of a trained practitioner." *Id.* "The fact a plaintiff would be helped by the assistance of an attorney does not, in itself, require appointment of counsel." *Maldonado v. Unnamed Defendant*, 648 F. App'x 939, 956 (11th Cir. 2016) (citing *Bass v. Perrin*, 170 F.3d 1312, 1320 (11th Cir. 1999)). In deciding whether legal counsel should be provided, the Court considers, among other factors, the merits of Plaintiff's claim and the complexity of the issues presented. *Holt v. Ford*, 862 F.2d 850, 853 (11th Cir. 1989).

In this case, Plaintiff has filed a § 1983 complaint on a standard complaint form designed for *pro se* litigants. The facts and legal issues involved in this case are fairly straightforward and the Court has not imposed any procedural requirements which would limit Plaintiff's ability to present his case. *See Kilgo v. Ricks*, 983 F.2d 189, 193-94 (11th Cir. 1993). Plaintiff has demonstrated the ability to prosecute his case and neither the facts nor the legal issues are particularly novel or complex. As such, Plaintiff's Motion for Appointment of Counsel (Doc. 18) is **DENIED**.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

A. <u>The Prison Litigation Reform Act</u>

Before the Court may address Plaintiff's claims on the merits, it must determine whether Plaintiff exhausted his available administrative remedies in accordance with the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). *Bryant v. Rich*, 530 F.3d 1368, 1372–78 (11th Cir. 2008) (noting that exhaustion is "a precondition to an adjudication on the merits"). "To exhaust administrative remedies in accordance with the PLRA, prisoners must properly take each step within the administrative process." *Id.* (internal quotation marks omitted). This rule applies even

2

where the administrative process is "futile and inadequate." *Alexander v. Hawk*, 159 F.3d 1321, 1325–28 (11th Cir. 1998). That said, administrative remedies must be "available" for the exhaustion requirement to apply. *See, e.g.*, *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1322–26 (11th Cir. 2007).

Because exhaustion is "a matter in abatement," it is properly the subject of dismissal. *Bryant*, 530 F.3d at 1374-75. As with other matters in abatement, courts may consider facts outside of the pleadings when determining whether a prisoner properly exhausted his available administrative remedies. *Id.* at 1376. Additionally, courts may resolve factual disputes so long as those disputes do not decide the merits, and so long as the parties have a sufficient opportunity to develop a record. *Id.*

In ruling upon motions to dismiss based upon the affirmative defense of failure to exhaust, courts in this Circuit follow a two-step process established by *Turner v. Burnside*, 541 F.3d 1077 (11th Cir. 2008). First, courts look to the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response, and if they conflict, the court takes the plaintiff's version of the facts as true. *Turner*, 541 F.3d at 1082. "If, in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed." *Id*. If the complaint is not subject to dismissal based on the plaintiff's version of the facts, the court must proceed to the second step, where it makes specific findings of fact in order to resolve the disputed factual issues related to exhaustion. *Id.* At the second step, it is the defendant's burden to prove that the plaintiff failed to exhaust his available administrative remedies. *Id.*

Also important to this specific case, "when a state provides a grievance procedure for its prisoners, as Georgia does here, an inmate alleging harm suffered from prison conditions must

file a grievance and exhaust the remedies available under that procedure *before* pursuing a § 1983 lawsuit." *Brown v. Sikes*, 212 F.3d 1205, 1207 (11th Cir. 2000) (emphasis added). Congress intended to afford prison officials time to address grievances internally before allowing a prisoner to initiate a federal lawsuit. *Porter v. Nussle*, 534 U.S. 516, 525 (2002). Thus, even if Plaintiff exhausted his administrative remedies after he filed his complaint, the Court cannot take action on those claims. See 42 U.S.C. § 1997e(a).

B.  Available Administrative Remedies

During the period relevant to this case, the Georgia Department of Corrections provided prisoners with a two-step grievance procedure. Doc. 17-1, pp. 14-27. At step one, a prisoner wishing to file a grievance is required to file no later than ten (10) calendar days from the date he knew or should have known of the facts underlying his grievance. *Id.* at 20. The procedure allows the Grievance Coordinator to waive this time limit "for good cause." *Id*. The Warden must respond within forty (40) days. *Id*. at 22. If this initial grievance is rejected, the prisoner is required to appeal within seven (7) calendar days. *Id.* at 24. If the time allowed for a response expires without a response, the Plaintiff may also file an appeal. *Id*.

The procedure also provides for the above-stated timelines to be waived by the grievance coordinator "for good cause." *Id.* at 8. Good cause is defined as: "A legitimate reason involving unusual circumstances that prevented the offender from timely filing a grievance or an appeal. Examples include: serious illness, being housed away from a facility covered by this procedure (such as being out on a court production order or for medical treatment)." *Id.* at 15. An inmate may file "a grievance about any condition, policy, procedure, or action or lack thereof that affects the offender personally." *Id.* at 18. However, disciplinary actions, including any punishment, fees, or assessments are determined to be "non-grievable." *Id.* The disciplinary

4

appeal procedure is located in GDC SOP IIB02-0001. *Id.*

A prisoner is allowed to have only two active grievances at any one time. *Id.* at 19. If a prisoner wishes to file a third grievance, the offender must first drop one of the current grievances or the third grievance will be rejected. *Id.* Certain grievances are allowed to be filed even if there are two current grievances, such as emergency grievances or grievances involving significant physical abuse. *Id.*

## **FACTUAL ALLEGATIONS**

1. <u>Plaintiff's version of the facts</u>

Plaintiff contends that Defendants denied his ability to observe numerous religious holidays and interfered with some of his religious property. Doc. 9. The Complaint states that during September of 2015, Defendants prevented Plaintiff from observing four major Jewish holidays: Rosh Hashanah from September 14-15, the Fast of Gedaliah on September 16, Yom Kippur from September 22-23, and Sukkot from September 28-29. *Id.* at 3-4. During these religious holidays, Plaintiff was not provided with traditional meals or allowed religious objects. *Id.*

On September 28, 2015, Plaintiff was transferred from Tier I to confinement in the Tier II management program. *Id.* at 5. During this transfer, Plaintiff's property was taken by prison officials to be inventoried, and certain religious items were not returned. *Id.* Plaintiff wrote to the property officer, grievance counselor, and inventory officer requesting that the items be returned. *Id.* On October 4, 2015, Plaintiff filed requests with Chief Counselor Mahoney and Counselor Clark to have the property returned. *Id.* Plaintiff made numerous other requests for his property over the following days and on October 13, 2015, Plaintiff was informed that his property had been misplaced. *Id.* On October 19, 2015, Plaintiff wrote a grievance regarding the lost property.

5

*Id.* Two days later, Plaintiff was informed his property had been found but that he could not have the property in the Tier II management program. *Id.* at 5-6. Plaintiff was given a new Siddur on October 26 by a prison chaplain. *Id.* at 6.

Plaintiff was escorted to the property room on November 2, 2015, where he was able to see all of his missing property. *Id.* Plaintiff was told he was unable to have the rest of his property, besides a Torah, in Tier II. *Id.* Plaintiff was brought his remaining property items on November 7, 2015. *Id.* During the fifty-one days without his religious property, from September to November, Plaintiff claims that he suffered from stress, aggravation, and feelings of bitterness and grief. *Id.* The "mental and physical anguish" made Plaintiff want to "give up on life." *Id.*

In December of 2015, Plaintiff wrote prison officials, including Defendant Ivey, regarding his observance of two Jewish holidays, Chanukah and the Fast of Tevet. *Id.* at 6-7. Plaintiff's request went "unanswered," and Plaintiff was not allowed to observe the religious holidays. *Id.* at 7. Plaintiff contends that he experienced severe depression, stress, and aggravation because of the denial of his opportunity to observe the religious holidays. *Id.*

In January of 2016, Plaintiff wrote a request to the prison chaplain regarding his observance of upcoming Jewish holidays in March and April: the Fast of Esther on March 23, Purim on March 24-25, and Passover on April 23-30. *Id.* On March 23, Plaintiff observed the Fast of Esther, but was not provided a sack lunch to break the fast. *Id.* During the holiday of Purim, Plaintiff was not provided kosher foods. *Id.* Plaintiff continued to request religious materials and permission to observe the religious holidays. *Id.* On April 19, 2016, Plaintiff was escorted to Defendant Ivey's office where he was informed that he would be allowed to celebrate Passover in his cell and that the religious materials for the holiday would be provided to him. *Id.* Two days later, Plaintiff was informed that he would not be allowed to celebrate Passover as it

violated the rules of Tier II. *Id.* at 8-9. On April 22, however, Plaintiff was provided a cell by himself to celebrate Passover but was not provided lettuce or Shmurah Matzoh. *Id.* at 9.[1]

Plaintiff has also complained that Defendants have acted in a manner that violated the Equal Protection Clause because he has not received any of his religious mail while members of other religions have received their mail. *Id*. at 9. On December 7, 2015, Plaintiff wrote the prison mailroom that he had not been receiving his "religious books, pamphlets, magazines, etc." *Id.* When he did not receive a response from the mailroom, Plaintiff wrote another request on December 28. *Id.* After Plaintiff failed to receive his Jewish religious materials, Plaintiff began to sign up to request Christian resources through the mail. *Id.*

On January 14, 2016, the mailroom clerk came by to visit Plaintiff and informed Plaintiff that the materials he was requesting by mail were not permitted in Tier II. *Id.* She told Plaintiff that the materials would be placed in his property box. *Id.* Plaintiff filed a grievance on January 19 because he continued to not get his Jewish materials but was receiving his Christian mail. *Id.* at 11. On February 15, Defendant Ivey informed Plaintiff he could not have any religious materials in Tier II, although he continued to receive his Christian mail. *Id.* Plaintiff was later allowed to have his Jewish daily devotionals. *Id.* Again, Defendant Ivey approached Plaintiff and instructed that he was only allowed to have a bible and nothing more. *Id.* at 12. After March 14, Plaintiff was able to receive all of his Jewish mail, but argues that during "the whole fight about religious materials" he was always able to receive Christian materials but not Jewish materials. *Id.* Plaintiff contends that treatment occurred solely because he was Jewish. *Id.*

Plaintiff acknowledges that he filed grievances regarding the alleged violations at GDOC "as far as I could." Doc. 23, p. 2. Plaintiff attempted to file numerous grievances while at GDOC,

---

[1] In Plaintiff's response he confirms that he was allowed to celebrate Passover but re-alleges that Defendants did not supply Plaintiff with lettuce for the meal nor was he allowed to a "Shumurah Matza." Doc. 23, p. 1.

7

but due to prison policies that only allowed two grievances to proceed at one time, Plaintiff "had to drop a grievance to file another which I felt was more important." *Id.* Plaintiff contends that "the main issue here should not be about my not exhausting my remedies but that the Defendants continue to violate my constitutional rights," and that "[Defendants] violate[d] their own I.O.P. (institutional operating procedures) by going over their allotted time to answer my grievances." *Id.*

Plaintiff has acknowledged that Grievance Number 205637 does not mention any confiscation of Plaintiff's religious items and that he later dropped this grievance. *Id.* at 6. Plaintiff has also stated that he noticed he stopped receiving mail on December 7, 2015, but wanted to "give the mailroom staff/officers time to properly response to my request" before filing a grievance. *Id.* Plaintiff contends that he has never received an oral explanation of the prison grievance procedures and did not receive a copy of the grievance handbook. *Id.* at 7-8.

2. Defendants' version of the facts

To support their version of the facts, Defendants have filed the affidavit of Chief Counselor Tamikia Mahoney (Doc. 17-1), Plaintiff's grievance history (*Id.* at 12, 29-54), GDOC standard operating procedures (*Id.* at 14-27), and the deposition of Plaintiff. Doc. 29-1, pp. 3-66.

Plaintiff filed two grievances, Grievance No. 205637 and Grievance No. 205641, on September 28, 2015. Doc. 17-1, pp. 29, 32; Doc. 29-1, pp. 5, 7. Grievance No. 205637 concerned several of Plaintiff's nonreligious property items that were confiscated by prison staff. Doc. 17-1, p. 29; Doc. 29-1, pp. 5-6. Plaintiff was told he could not possess these items while in Tier I and that the items would be placed in holding until he was released from Tier I. *Id.* Grievance No. 205641 concerned Plaintiff's religious property, specifically Plaintiff's prayer book. Doc. 17-1, p. 32; Doc. 29-1, p. 6-7. Plaintiff later dropped Grievance No. 205641, on November 10, 2015,

8

"when [Plaintiff] went to file the third grievance." Doc. 17-1, p. 29; Doc. 29-1, pp. 7-8.

Grievance No. 20716 was filed on October 13, 2015. Doc. 17-1, p. 34; Doc. 29-1, p. 8. This grievance concerned religious property that was taken from Plaintiff's cell. Doc. 17-1, pp. 34, 42; Doc. 29-1, pp. 7-8. On October 22, 2015, Plaintiff's grievance was denied because the items had been returned to Plaintiff, and on February 23, 2016, Plaintiff's appeal of Grievance No. 20716 stated "[t]his appeal is <u>no longer needed</u>, due to the fact I've already received all my [items]." Doc. 17-1, p. 44. Plaintiff decided to drop Grievance No. 20716 on February 29, 2016, "because I actually had received my property; returned my property back to me." Doc. 17-1, p. 45; Doc. 29-1, pp. 9-10. Plaintiff grievance history notes that the appeal was officially dropped on August 22, 2016. Doc. 17-1, p. 12.

Grievance No. 211864 was filed on January 19, 2016. Doc. 17-1, pp. 47-48; Doc. 29-1, p. 10. Plaintiff alleged that he never received several items of religious mail that his Rabbi sent him in December of 2015. Doc. 29-1, pp. 10, 14. The initial investigation showed that Plaintiff's mail was in the property room because Plaintiff was not authorized to receive books or magazines while in Tier II and that Plaintiff was "only to have the Torah for your religious needs". Doc. 17-1, p. 48. Grievance No. 211864 was ultimately denied on August 10, 2016, by the Appeals Council because the Plaintiff failed to follow proper procedure. *Id.* at 49.

Plaintiff also filed two additional grievances while at HSP, Grievance No. 220215 and Grievance No. 228694. Doc. 17-1, pp. 51-53. Grievance No. 220215 requested that money be returned to Plaintiff's inmate bank account due to overcharging by the prison business office. *Id.* at 51. This grievance was denied on August 5, 2016. *Id.* at 12. Grievance No. 228694 was filed on September 30, 2016, regarding religious packages Plaintiff ordered from Amazon. *Id.* at 53. Plaintiff stated that the packages arrived on August 31, 2016, but that the mailroom official

9

stated she "needed to get permission from [Defendant] Ivey to see if [Plaintiff] could have them in the Tier II Phase III Program." *Id.* Plaintiff stated he was advised the items were denied because they came from Amazon. *Id.* This grievance was dropped by Plaintiff on October 5, 2016, because Plaintiff received the items. *Id.* at 12.

In his deposition, Plaintiff acknowledged that he never filed a grievance in December of 2015 or the spring of 2016 regarding not being allowed to participate in his religious holidays. Doc. 29-1, p. 12. Plaintiff later offered a conflicting statement that he wrote an emergency grievance in August of 2015 regarding the approaching religious holidays. *Id.* at 13. Plaintiff stated it was possible he did not file this grievance with a counselor at HSP but that he possibly only mailed it to the Central Office in Forsyth. *Id.*

## DISCUSSION

As an initial matter, the Court must examine Plaintiff's argument, liberally construed, that the administrative remedies at HSP were unavailable because he could only have two active grievances at one time. Doc. 23, p. 2. Plaintiff stated that when he wanted to file a third grievance he "dropped whatever was the lesser evil" in order to file a third, new grievance. Doc. 29-1, p. 8. Insofar as Plaintiff is attempting to contend the grievance procedure was not available to him, his argument is unpersuasive. Several courts have held that such grievance limitations do not render the grievance process unavailable to a prisoner. *Pearson v. Taylor*, 665 F. App'x 858, 868 (11th Cir. 2016); *Cummings v. Crumb*, 347 F. App'x 725, 727 (3d Cir. 2009) (being on grievance restriction did not prevent inmate from exhausting his remedies); *Simpson v. Allen*, 2016 WL 5024226, at *7 (S.D. Ga. Sept. 16, 2016), *report and recommendation adopted*, 2016 WL 6609195 (S.D. Ga. Nov. 7, 2016). The GDOC policy allows inmates to withdraw a pending grievance in order to file a new one and allows several exceptions to the limit of two active

grievance. Accordingly, Plaintiff had an available avenue to exhaust his numerous grievances, "even if it would have required him to prioritize his grievances." *Pearson*, 665 F. App'x at 868.

Plaintiff also claims that he was not informed of the grievance procedure policy when he first came to HSP, as required by GDOC policies. Doc. 29-1, pp. 4-5. Plaintiff states that he did not know he had to file grievances and exhaust them before filing a federal claim. *Id.* When asked why he filed any grievance before the filing of his federal lawsuit, Plaintiff stated that he did so because he "knew [he] was being wronged," and because other inmates instructed him to do so. *Id.* Plaintiff alleges that he received a copy of the inmate lawyer's handbook in April of 2016, after he had already filed his lawsuit. *Id.*

Defendants have presented the affidavit of Tamikia Mahoney, Chief Counselor at HSP. Doc. 17-1. Counselor Mahoney stated that "each inmate, including [Plaintiff], receives an oral explanation of the grievance procedure as well as a copy of the Orientation Handbook for Offenders, which includes instructions about the grievance procedure. Additionally, inmates have access to a copy of this policy at each prison's library." *Id.* at 3. Plaintiff's version of the facts, accepted as true, conflict with Defendants' version of the facts. The Court must therefore turn to the second step of the *Turner* analysis.

The evidence establishes that Plaintiff had knowledge and was informed of the grievance procedure before filing his federal lawsuit. Defendants have met their burden by providing Plaintiff's deposition where he offers conflicting statements about his knowledge of the grievance procedure. Plaintiff begins by stating that he received the inmate lawyer's handbook and that "I read through that, and that's when I proceeded to file my . . . ." Doc. 29-1, p. 4. This sentence was not completed due to Defendants' counsel asking Plaintiff when he received the handbook, to which Plaintiff changed his answer to say that he received the handbook "right

11

after I filed the [current lawsuit]." *Id.* at 5.

The conflicting statements continue when Plaintiff affirms that he had no knowledge of the grievance process until he got the inmate handbook in 2016. *Id.* Later in his deposition, Plaintiff states that Counselor Robins talked to him about the grievance procedure, but "[n]ot until I started filing my first grievance." *Id.* Plaintiff's grievance history shows that Plaintiff first filed a grievance, Grievance No. 205637, on September 28, 2015. Doc. 17-1, 12. According to Plaintiff's testimony, then, Counselor Robins would have informed Plaintiff of the grievance procedure in the fall of 2015, almost seven months before he filed his federal lawsuit.

Ignorance of the exhaustion requirement does not excuse Plaintiff's failure to exhaust. *Gonzalez v. Crawford*, 419 F. App'x 522, 523 (5th Cir. 2011). Additionally, Counselor Robins' affidavit and Plaintiff's own sworn statement establish that he was aware of the grievance procedure before filing his federal lawsuit. Given this evidence within the record, Defendants are entitled to dismissal at step two of the *Turner* analysis. *Wright v. Langford*, 562 F. App'x 769, 776 (11th Cir. 2014) (holding it was reasonable for the district court to discredit inmate's purported ignorance based on official's affidavit and inmate's prior grievance history); *Bryant v. Rich*, 530 F.3d 1368, 1377 (11th Cir. 2008) (affirming, as reasonable, the district court's determination that the inmate was denied access to grievance forms was not credible, given unrebutted evidence that the plaintiff had previously filed a grievance); *May v. Young*, No. 5:11-CV-326 MTT, 2013 WL 5144041, at *3 (M.D. Ga. Sept. 12, 2013).

1. Plaintiff's Claims Regarding Observance of Religious Holidays

As to Plaintiff's claims that he was unable to participate in several Jewish holidays in September 2015, December 2015, and the spring of 2016, Defendants are entitled to dismissal at step two of the *Turner* analysis. Plaintiff alleges that he filed grievances concerning the

prohibition on observance of his religious holidays but that this grievance was never "logged or given a log [number]." Doc. 23, p. 5; Doc. 29-1, p. 12-13. In his deposition, Plaintiff admitted he never filed a grievance in December of 2015 or the spring of 2016 regarding his observance of religious holidays. Doc. 29-1, p. 12. Plaintiff later clarified that he wrote an emergency grievance in August of 2015 regarding the approaching holidays, but conceded that it was possible he only mailed it to the Central Office in Forsyth. *Id.* at 12-13.

Defendants claim that Plaintiff never filed a grievance regarding any bar to observance of religious holidays. Doc. 17, p. 6. Given the disputed factual allegations, the Court must view the Plaintiff's version of the facts as true. *Turner*, 541 F.3d at 1082. Accepting Plaintiff's allegations, Plaintiff's claims are not subject to dismissal pursuant to step one of the *Turner* analysis. *Id.* The Court must move to step two of the analysis and make specific findings of fact in order to resolve the disputed factual allegations. *Id.*

Defendants are entitled to dismissal at step two of the *Turner* analysis because the evidence shows that Plaintiff never filed a grievance regarding the observance of his religious holidays. Plaintiff's grievance history demonstrates that Plaintiff filed six grievances during his incarnation at HSP. Doc. 17-1, p. 12. Grievances No. 205637 and No. 205641 were both filed on September 28, 2015. Doc. 17-1, p. 29, 32; Doc. 29-1, p. 5, 7. Grievance No. 205637 alleged that several of Plaintiff's nonreligious materials were confiscated by prison officials. Doc. 17-1, p. 29; Doc. 29-1, p. 5-6. This grievance was ultimately denied on appeal. Grievance No. 205641 concerned Plaintiff's religious property being confiscated. Doc. 17-1, p. 32; Doc. 29-1, p. 6-7. This grievance was ultimately dropped by Plaintiff on November 10, 2015. Doc. 17-1, p. 2; Doc. 29-1, p. 7-8.

Grievance No. 20716 was filed on October 13, 2015, and concerned the confiscation of

several of Plaintiff's religious items. Doc. 17-1, p. 34; Doc. 29-1, p. 8. This grievance was denied on October 22, 2015, because the items had been returned to Plaintiff and Plaintiff officially withdrew his appeal on August 22, 2016. Doc. 17-1, p. 45; Doc. 29-1, p. 9-10.[2] Grievance No. 211864 was filed on January 19, 2016, and was filed because Plaintiff complained he was not receiving his religious mail. Doc. 17-1, p. 47-48; Doc. 29-1, p. 10. The Appeals Council denied this grievance in August of 2016 for Plaintiff's failure to follow proper procedures. Doc. 17-1, p. 48.

Plaintiff's last two grievances filed during his incarnation at HSP did not concern his celebration of religious holidays. Grievance No. 220215 concerned an issue of money Plaintiff believed the prison owed to him due to an overcharge. Doc. 17-1, p. 51. This grievance was ultimately denied on August 5, 2016. *Id.* at 12. Grievance No. 228694 was filed on September 30, 2016, and concerned religious packages that Plaintiff had ordered from Amazon. *Id.* at 53. Plaintiff contended that Defendant Ivey was withholding these packages from Plaintiff but Plaintiff dropped the grievance on October 5, 2016, after the items were delivered to Plaintiff. *Id.* at 12, 54.

The above evidence illustrates that Plaintiff filed numerous grievances while at HSP, but that none of those grievances concerned Defendants' alleged prohibition of Plaintiff's observance of any religious holidays. Plaintiff had access to grievance forms yet failed to file a relevant grievance before filing the present federal lawsuit, in violation of the PLRA. Accordingly, Defendants are entitled to dismissal.

2. <u>Plaintiff's Claims Regarding Confiscation of Religious Property</u>

Defendants are entitled to dismissal at step one of the *Turner* analysis regarding

---

[2] Plaintiff's appeal of the denial of Grievance No. 20716 stated that "[t]his appeal is <u>no longer needed,</u> due to the fact I've already received all my [items]." Doc. 17-1, p. 44.

Plaintiff's claim of the confiscation of religious property. As noted above, Plaintiff filed two grievances regarding the confiscation of his religious property, Grievance No. 205641 and Grievance No. 20716. Doc. 17-1, pp. 32, 34; Doc. 29-1, p. 7-8.[3] Both grievances were voluntarily dropped by Plaintiff prior to completing the administrative process. Doc. 17-1, pp. 2, 8, 45; Doc. 29-1, pp. 7-10. Because Plaintiff voluntarily dropped these grievances, administrative remedies were left unexhausted by Plaintiff and "proper exhaustion" was not achieved. *Woodford v. Ngo*, 549 U.S. 81, 90, 93-97 (2006). There are no conflicting facts, and Defendants are entitled to dismissal at step one of the *Turner* analysis.

3. <u>Plaintiff's Withholding of Religious Mail and Equal Protection Claims</u>

Defendants are entitled to dismissal of Plaintiff's claims regarding his non-receipt of his religious mail under step one of the *Turner* analysis. Plaintiff contends that on December 7, 2015, he wrote to the prison mailroom staff complaining that he not received his religious mail. Doc. 9, p. 9-10. Plaintiff waited to file a grievance because he wanted to give the mailroom time to respond to his request. Doc. 23, p. 6. During this time, Plaintiff signed up for Christian materials and received those materials through the mail. Doc. 9, p. 11-13. Plaintiff contended that the only reason he was not receiving his Jewish materials was because of prejudice towards Jews. *Id.* at 12. This claim has been liberally construed to be an equal protection claim.

Plaintiff filed a grievance, Grievance No. 211864, on January 19, 2016, over a month after he realized his mail was missing. Doc. 17-1, pp. 47-48; Doc. 29-1, p. 10. The present lawsuit (Doc. 1) was filed April 8, 2016, almost four months before Grievance No. 211864 was ultimately denied on appeal. Doc. 17-1, p. 49. By filing his federal lawsuit before his

---

[3] Plaintiff filed Grievance No. 205637 regarding the confiscation of his property by prison officials. Doc. 17-1, p. 29; Doc. 29-1, p. 5-6. As noted in the previous section, this grievance did not mention any religious items being confiscation, only nonreligious items. *Id.* In his deposition, Plaintiff admits that Grievance No. 205637 does not mention the confiscation of his religious items. Doc. 23, p. 6. Accordingly, this grievance would be insufficient to be construed to regard the confiscation of religious items.

15

administrative remedies were completely exhausted, Plaintiff violated the PLRA. *Smith v. Terry*, 491 F. App'x 81, 82-83 (11th Cir. 2012); *Brown*, 212 F.3d at 1207. Although Grievance No. 211864 was exhausted on August 10, 2016, it "did not change the important historical fact: his administrative remedies were unexhausted when he filed his original complaint." *Smith*, 491 F. App'x at 83. Because Plaintiff did not properly exhaust his claims regarding the withholding of religious mail or any equal protection claim before filing his federal lawsuit, Defendants are entitled to dismissal at step one of the *Turner* analysis.

## **CONCLUSION**

Plaintiff failed to comply with "proper exhaustion" before proceeding with his § 1983 lawsuit. His failure warrants the dismissal of his claims. *Woodford*, 548 U.S. at 90, 93–97. Plaintiff had knowledge of the grievance procedure before filing his lawsuit, and the two active grievance policy did not render the process unavailable to Plaintiff. Accordingly, it is **RECOMMENDED** that Defendants' Motion to Dismiss (Doc. 17) be **GRANTED**, and that Plaintiff's Complaint be **DISMISSED.** Additionally, it is **ORDERED** that Plaintiff's Motion to Appoint Counsel (Doc. 18) is **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this Recommendation, or seek an extension of time to file objections, **WITHIN FOURTEEN (14) DAYS** after being served with a copy thereof. The District Judge shall make a de novo determination of those portions of the Recommendation to which objection is made. All other portions of the Recommendation may be reviewed for clear error.

The parties are further notified that, pursuant to Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to

challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."

**SO ORDERED AND RECOMMENDED**, this 5th day of May, 2017.

s/ Charles H. Weigle
Charles H. Weigle
United States Magistrate Judge